UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.:

WALQUIRIA CASSINI,
MATTHEW CASSINI,
and RYAN LONDONO,

     Plaintiffs,

v.

RIC BRADSHAW, in his official capacity as Sheriff of Palm Beach County, Florida; and
AMY HOFFMAN, in her individual capacity,

     Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Walquiria Cassini, Matthew Cassini and Ryan Londono bring this Complaint and Demand for Jury Trial against Defendants, Ric Bradshaw, in his official capacity as Sheriff of Palm Beach County, Florida and Detective Amy Hoffman, in her individual capacity, and for cause of action, allege the following:

### NATURE OF THE ACTION

1. This case arises from a pattern of unconstitutional conduct rooted in confirmation bias and a culture of unaccountability perpetuated by deliberate indifference. What Defendant Hoffman could not make fit, she omitted. What she could not omit, she distorted. What she could not distort, she buried. The result was a materially false sworn affidavit, perjured bond hearing testimony, the systematic suppression of exculpatory evidence, and the imprisonment of innocent people on the most serious charges the law provides. All made possible by an institution that had no policy, no supervision, and no mechanism to ask the one question that should have been asked from the beginning: what does the evidence actually prove?

1

2.      On March 5, 2024, Defendant Hoffman swore to arrest affidavits accusing Walquiria Cassini, Matthew Cassini, and Ryan Londono of unimaginable acts of child sexual abuse and exploitation. The allegations emerged amidst a bitter child custody dispute between Walquiria Cassini and the biological father of two of her sons, a man who had also been her domestic partner for 20 years. After a more than three-month pre-arrest investigation failed to produce a single piece of corroborating evidence, the arrests were secured through an affidavit that embellished, omitted, and distorted material facts to create the illusion of probable cause. So sensational was Defendant Hoffman's affidavit that the first appearance judge remarked that it shocked his conscience more than any case in his lengthy career.

3.      Defendant Hoffman pursued this case with a preexisting narrative, seemingly intent on branding the Plaintiffs as heinous offenders to advance her career in a high-profile, media-saturated investigation. She shaped the arrest around a sensational theory rather than the facts. Sheriff Ric Bradshaw, in his official capacity as the Palm Beach County Sheriff, allowed this injustice to occur by failing to implement appropriate policies and supervision both before Plaintiffs' arrest and during the lengthy prosecution predicated on those arrests.

4.      Charged with felonies carrying mandatory life sentences, Plaintiffs were held without bond after first appearance. They were publicly branded as monstrous child predators and their home portrayed as a house of horrors.  Salacious details and unfounded accusations in Defendant Hoffman's affidavit fed a viral news cycle, exposing Plaintiffs to widespread public scrutiny and permanently tarnishing their reputations before the allegations were ever tested.

5.      Walquiria Cassini and Ryan Londono remained incarcerated for more than 135 days in the Palm Beach County Jail before being placed on strict house arrest, fitted with GPS ankle monitors for 473 days, forbidden from accessing the internet even to participate meaningfully in their own

defenses, and prohibited from contact with one another.  Both were gainfully employed before their arrests and both lost their employment as a result.

6.      Matthew Cassini was only 20 years old when the stigma of sexually abusing his own brothers was recklessly thrust upon him.  At a stage in life when a young man's identity, reputation, and social standing are still taking shape, Matthew Cassini was publicly branded a deviant sexual predator facing the prospect of mandatory life in prison for crimes he did not commit.  In Matthew Cassini's case, he spent 178 days in the Palm Beach County Jail and 80 days on house arrest.

7.      For nearly twenty months, Plaintiffs vigorously pursued exoneration in the face of public pressure and mounting legal bills. Throughout that nightmare, Defendant Hoffman and the Palm Beach County Sheriff's Office doggedly and maliciously clung to the narrative crafted to secure Plaintiffs' arrests. She testified deceptively in opposition to Plaintiffs' requests for bond. She withheld material exculpatory evidence from both Plaintiffs and prosecutors. She willfully ignored and/or was recklessly indifferent to all evidence of Plaintiffs' innocence. And when cornered, after Plaintiffs fought to obtain the evidence to prove their innocence and caught Defendant Hoffman in an escalating web of lies, she attempted to obstruct Plaintiffs' exercise of their due process rights by refusing to provide sworn deposition testimony or participate in the discovery process.

8.      On the eve of their criminal trials, the prosecutions finally collapsed. On October 30, 2025, after a thorough review of all digital and testimonial evidence, the State filed a formal Nolle Prosequi, dismissing all charges against all three Plaintiffs, acknowledging it could no longer proceed in good faith because new information was brought to the State's attention.

9.      The harm and destruction caused by Hoffman could have been prevented. The Palm Beach County Sheriff's Office failed to supervise Defendant Hoffman prior to Plaintiffs' arrest and after. The arrest affidavit was never scrutinized by a supervisor nor meaningfully fact checked by the

FBI Agent that produced most of the investigative results Hoffman details. Defendant Ric Bradshaw failed to implement appropriate policies for investigating and corroborating allegations made during child custody disputes allowing law enforcement to be weaponized by one parent against another. The Palm Beach County Sheriff's Office also failed to implement policies requiring its officers to independently verify information received from law enforcement partners in other agencies.  Finally, Defendant Ric Bradshaw, as the elected Palm Beach County Sheriff, failed to implement any policies requiring the continued disclosure to prosecutors of all investigative updates, including exculpatory *Brady* material, after an arrest and a prosecution begins.  This failure led to the "new information" cited by the State Attorney's Office in dismissing the charges.  But make no mistake, the information was only new to the State Attorney's Office because it had been withheld by the Palm Beach County Sheriff's Office, and it was only produced in response to Plaintiffs' persistent demands and pursuit of exoneration.

10.     This case is about the Fourth Amendment's protection against seizure based on false or recklessly misleading sworn statements. It is about the Fourteenth Amendment's guarantee that the government may not fabricate, embellish, or distort evidence to deprive citizens of liberty. It is about the constitutional obligation to disclose exculpatory evidence pursuant to *Brady v. Maryland.* And it is about accountability, both individual and institutional, when those constitutional boundaries are crossed.

## JURISDICTION AND VENUE

11.     This action arises under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

13.     Supplemental jurisdiction over any state-law claims exists pursuant to 28 U.S.C. § 1367.

4

14.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) because the events and omissions giving rise to Plaintiffs' claims occurred in Palm Beach County, Florida.

## PARTIES

15.     Plaintiff Walquiria Cassini is an adult individual who resides in the Southern District of Florida. At all times relevant hereto, she was a resident of Palm Beach County, Florida.

16.     Plaintiff Matthew Cassini is an adult individual who resides in the Southern District of Florida. At all times relevant hereto, he was a resident of Palm Beach County, Florida.

17.     Plaintiff Ryan Londono is an adult individual who resides in the Southern District of Florida. At all times relevant hereto, he was a resident of Palm Beach County, Florida.

18.     Defendant Detective Amy Hoffman (hereinafter "Hoffman") is an adult individual who, at all times relevant hereto, was employed by the Palm Beach County Sheriff's Office (hereinafter "PBSO") as a Detective assigned to its Special Victims Unit. All of Hoffman's actions and omissions described herein were taken under color of state law. She is sued in her individual capacity.

19.     Defendant Ric Bradshaw (hereinafter "Sheriff Bradshaw") is the duly elected Sheriff of Palm Beach County, Florida, and at all times relevant hereto served as the final policymaker for PBSO with respect to law enforcement operations, investigative protocols, training, supervision, and disclosure obligations. He is sued in his official capacity.

## FACTUAL BACKGROUND

**A Report of Parental Kidnapping and Retaliatory Allegations of Sexual Abuse**

20.     On November 27, 2023, Plaintiff Walquiria Cassini called PBSO to report that her two boys, 14-year-old M.A.M. and seven-year-old M.J.M. had been kidnapped by their father, Walquiria Cassini's former domestic partner.

5

21.     Until Thanksgiving break of 2023, M.A.M. and M.J.M. lived in a home in Boca Raton with their mother, Walquiria Cassini, her romantic partner Ryan Londono, and their older half-brother, Matthew Cassini, Walquiria's eldest child.

22.     M.A.M. and M.J.M. went to Ocala for Thanksgiving to stay with their father and their paternal grandmother.  When the boys did not return on Thanksgiving as previously agreed to, Walquiria Cassini began frantically trying to contact them and their father to no end.  On Monday November 27, 2023, the boys were marked absent from their respective Palm Beach County schools and Walquiria Cassini sought help from the very agency that would later arrest her.

23.     Walquiria informed her ex that she was going to call the police and report him for kidnapping. In response to that, her ex called the police in Ocala to report that the boys had been sexually abused.  He inquired whether his report of sexual abuse would allow him to maintain custody of the boys.

24.     Experienced law enforcement officers in both Palm Beach and Marion counties immediately recognized the possibility that the reported sexual abuse was a ploy by one parent to gain the upper hand in a custody dispute.  In body-worn conversations, these officers expressed doubts to each other about the veracity of the allegations. Nonetheless, these officers appropriately referred the report to the Department of Children and Families and to special victims investigators in their respective agencies for further investigation.

25.     On November 30, 2023, PBSO assigned Hoffman to investigate these allegations. Hoffman ignored the importance of the child custody dispute that was the backdrop for this investigation.

26.     Shortly after Hoffman was assigned to the investigation, M.A.M. and M.J.M. were interviewed in Ocala.  Hoffman neither attended nor participated in these interviews.  M.A.M. and

M.J.M. disclosed a lurid story of being sexually penetrated by all three Plaintiffs while the abuse was live streamed on the internet.  While the allegations were disturbing and undoubtedly warranted investigation, the accounts were also riddled with blaring warning signs of parental coaching and alienation and parroted language that a reasonably diligent investigator would have weighed in evaluating the credibility of the disclosure.  Following the interviews, M.A.M. and M.J.M. declined physical sexual examinations.

**A Fruitless Search for Corroborating Evidence**

27.     From the outset, the investigation included allegations of transmission and online dissemination of child pornography, which prompted the involvement of the Federal Bureau of Investigation. In December of 2023 the FBI opened a parallel investigation, assigning Special Agent Sara Talley as the lead agent.  Agent Talley contacted Hoffman, and it was agreed that the FBI would investigate potential crimes of internet exploitation while PBSO investigated the alleged hands-on abuse.  During the ensuing three months, PBSO and the FBI worked together, sharing information and resources.

28.     In January 2024, the FBI began serving grand jury subpoenas on dozens of social media companies, internet service providers, financial institutions, e-commerce platforms and adult websites.

29.     Through its investigation, the FBI became interested in a user of the adult website motherless.com with the username "bigp92".  The FBI developed this investigative lead after learning the user deleted his or her account and its associated content on or about November 28, 2023.

30.     In response to a grand jury subpoena, motherless.com disclosed that user bigp92 created an account in 2019 from an IP address in Reynoldsburg, Ohio. The account login history showed

sporadic logins on the T-Mobile cellular network, but an overwhelming majority of recent logins were from a residential IP address in Zephyrhills, Florida. In response, the FBI served a grand jury subpoena to the internet service provider for the residence in Zephyrhills. The provider responded in February 2024, identifying a real person with the initials A.K., who was born in 1992 in Reynoldsburg, Ohio and relocated in 2021 to Zephyrhills, Florida. This individual had no connection to Plaintiffs and Hoffman never attempted to contact him. The FBI shared these results.

31.     At no point did any digital evidence concerning motherless.com lead to Plaintiffs or their home in Boca Raton. The lead incontrovertibly reached a dead end *before* Plaintiffs' arrest and thus before Hoffman's probable cause affidavit.

32.     Other FBI subpoenas and investigative efforts revealed no evidence corroborating the allegations. Instead, the subpoena responses revealed intimate information about the entirely legal internet activities of private citizens in our modern world: transactions on Zelle, Venmo and Cashapp among friends and neighbors; de minimis purchases of cryptocurrency by Plaintiff Ryan Londono; social media accounts with zero connection to the viewing, receipt or dissemination of child sexual abuse material; and online purchases, by adults, of legal sexual wellness products.

33.     In addition to the grand jury subpoenas, a team of law enforcement officers, including Hoffman and Agent Talley, traveled to Ocala on February 27-28, 2024 to meet with M.A.M., M.J.M. and their father. Before this trip, investigators informed the father that they would be requesting consent to digitally copy M.A.M. and his father's phones. The father refused. M.A.M. initially refused before reluctantly agreeing. On March 2, 2024, *before* Plaintiffs' arrests, Hoffman received a working copy of M.A.M.'s cellphone extraction, which she failed to log into evidence.

**Arrests Predicated on the Illusion of Probable Cause**

34.     Upon information and belief, the Palm Beach County State Attorney's Office adheres to a de facto "plus one" policy when evaluating allegations of child sexual abuse.  This practice requires allegations to be supported by at least one piece of corroborating evidence–physical evidence, digital evidence, a confession obtained via a controlled call or text message–something.  This investigative best practice is especially crucial when complainants are children caught in the middle of a custody dispute.

35.     After more than three months of investigation, Hoffman had no corroborating evidence. Instead, she crafted a sensational arrest affidavit filled with conclusory statements that misrepresented material facts and omitted all context that did not fit her narrative.

36.     Hoffman lied that Plaintiff Ryan Londono erased 33 files from motherless.com the day after her investigation began after describing  motherless.com as a "moral-free file host."

37.     Hoffman falsely asserted that an IP address "linked" to all three Plaintiffs had previously downloaded child sexual abuse material.

38.     Hoffman misrepresented Plaintiffs' use of common financial platforms like Venmo and Plaintiff Ryan Londono's purchase of cryptocurrency to suggest such transactions were consistent with and therefore corroborate internet sexual exploitation of children.

39.     Hoffman referenced Plaintiffs' legal purchases on Amazon.com of adult sexual wellness products and even mentioned Plaintiff Walquiria Cassini's professional TikTok account that focused on treating erectile dysfunction. Hoffman painted a clear picture–for the judge who would consider bond, for the media, and for the public–of sexual deviants living in suburbia.

40.     It was all an illusion to conceal the absence of any corroborating evidence.  Every conclusion and insinuation Hoffman included in her affidavit was derived from responses to the FBI's extensive subpoenas.  Hoffman received those responses.  Yet she never shared a draft of

9

her affidavit with Agent Talley or asked her for clarification or confirmation of any of the conclusions she drew to fit her narrative. PBSO abrogated its duty to supervise by failing to fact-check or scrutinize Hoffman's conclusions before Plaintiffs suffered the irreparable harm of wrongful arrests.

41.     Equally material were the omissions.  Hoffman's arrest affidavit includes no context concerning the ongoing child custody dispute inextricably intertwined to the allegations.  She included no mention of the absence of physical evidence from the refused medical examinations and failed to mention M.A.M.'s cellphone extraction even though she embarked on an overnight trip one week before the arrest to obtain it.

42.     On March 5, 2024, Hoffman arrested Walquiria Cassini and Ryan Londono on charges of Sexual Battery on a Person Less Than Twelve (12) Years of Age; Sexual Battery Upon a Child (Familial or Custodial) (two counts); and Lewd or Lascivious Molestation. She arrested Matthew Cassini on two counts of Sexual Battery Upon a Child Under Twelve Years of Age, in violation of § 794.011(2)(a), Florida Statutes.  These charges carried mandatory life sentences and all three Plaintiffs were held without bond.

43.     Hoffman's affidavit ignited a media frenzy.  More importantly, it became the foundation for a prosecution that would span 19 months. Prosecutors presented the affidavit to judges at various hearings to oppose bond and conditions of release. The affidavit was never corrected, supplemented, or retracted by Hoffman or PBSO.

44.     Hoffman's affidavit distorted the truth and omitted material facts to secure Plaintiffs' arrests and sensationalize the case.

**Hoffman and PBSO Obstruct Due Process**

45. After securing Plaintiffs' arrests, Hoffman doubled down. She continued material investigative work, ignoring exculpatory evidence and twisting facts to support her theories.

*Inaccurate and Incomplete Supplemental Reports*

46. Upon information and belief, PBSO detectives are trained and instructed to prepare supplemental reports recapping all investigative work performed. They are trained and instructed to provide all such reports to prosecutors at the time an arrest is made. Upon information and belief, PBSO has not implemented any policies concerning the ongoing production of supplemental reports to prosecutors for work performed after an arrest is made.

47. After securing Plaintiffs' arrests, Hoffman provided prosecutors with an initial batch of supplemental reports consisting of 27 pages. She omitted the report referencing her receipt of M.A.M.'s cellphone extraction on March 2, 2024. As it turns out, a total of 31 pages of reports prepared by Hoffman, including reports of substantive investigative work – exculpatory DNA analysis and communications between Hoffman and the FBI, were never disclosed to prosecutors. Only after the insistence of Plaintiffs' defense attorneys were those additional reports provided simultaneously to prosecutors and Plaintiffs' criminal defense counsel on October 22, 2025.

48. The reports themselves were flawed and inaccurate. For example, Hoffman falsely asserted that Plaintiff Walquiria Cassini refused to submit to a post-arrest polygraph examination. An audio recording of the relevant interaction confirms that Walquiria Cassini agreed to submit to the polygraph examination, and that it was the polygraph examiner who declined to proceed, citing Walquiria's emotional condition at the time.

49. Despite this, Hoffman's supplemental report deliberately characterized it as Walquiria Cassini's refusal to be subject to a polygraph examination, a material misrepresentation calculated to cast suspicion on Walquiria Cassini and undermine her credibility.

11

50. Omissions in Hoffman's supplemental reports are also notable. Digital forensic examiners, first from the FBI and then PBSO, scoured dozens of Plaintiffs' digital devices in search of any child sexual abuse material. None was ever found. But Hoffman did not find that fact worth mentioning in a written report.

*Loss or Destruction of Material Evidence*

51. On March 5, 2024, after arresting Plaintiffs, Hoffman used a cellphone to conduct a recorded interview of Plaintiff Walquiria Cassini.

52. That recording was neither submitted to prosecutors nor provided to defense counsel, depriving the prosecution and the defense of potentially material evidence.

53. As previously discussed, Hoffman received a working copy of M.A.M.'s cellphone extraction report on March 2, 2024, three days before the arrests. Hoffman did not include her report documenting her receipt of this evidence in her post-arrest submission to prosecutors.

54. Throughout the case, based on representations made by Hoffman, prosecutors insisted the State did not possess any digital evidence to provide to Plaintiffs or their criminal defense counsel. All digital evidence, prosecutors insisted, was in the custody of the FBI.

55. Despite its obvious materiality and repeated requests from defense counsel, neither Hoffman nor anyone from PBSO could answer what became of this evidence. Finally, under escalating pressure from both defense counsel and prosecutors to answer that question, Hoffman traveled to the FBI field office on October 16, 2025, to obtain a *new* copy of the extraction report. What happened to the original extraction report copy she got back in March 2023 remains unanswered.

56. When the extraction report was ultimately produced, it contained evidence that was favorable to all three Plaintiffs and material to their defense. The extraction revealed extensive

messages between M.A.M. and his father.  The messages show a clear pattern of manipulation including the use of toxic misogynist rhetoric to poison M.A.M. against his mother, and thinly veiled references to "plans" and gathering evidence to support the father's custody battle. The extraction report also contained evidence of deleted conversations and internet browser history for the months of November and December 2023.

*False Testimony in Support of Continued Pretrial Detention*

57.     On May 10, 2024, after 65 days of detention, Plaintiffs Walquiria Cassini and Ryan Londono exercised their right to a pre-trial detention hearing asking the trial court to release them on bond.  Hoffman was the prosecution's star witness, testifying under oath in opposition to any pre-trial release.

58.     Hoffman doubled down on each assertion in her arrest affidavit.  When it was revealed that no child sexual abuse material had been located on any of Plaintiffs' devices, Hoffman again misrepresented that Ryan Londono deleted evidence from motherless.com and therefore likely deleted evidence from other devices.

59.     Hoffman also misrepresented to the court that DNA testing of sexual devices was in progress, essentially asking the Court to delay pre-trial release until those results came in.  The truth is that DNA testing of those devices could not have been in progress, because Hoffman did not obtain oral DNA standards from M.J.M. and M.A.M., against which DNA from the devices could be compared, until July of 2024, two months *after* the bond hearing.  Unsurprisingly, the accusers' DNA was not found on any of the seized devices.

60.     Hoffman knowingly and deliberately gave false testimony with the intent to mislead the court, defend her arrest decision and perpetuate Plaintiffs' unconstitutional detention.

*Hoffman Obstructs Discovery*

13

61.     As Plaintiffs' criminal trials approached, their respective defense counsel attempted to engage in good faith with Hoffman to obtain critical missing evidence.  But as the extent of her misrepresentations and concealment of evidence became apparent, Hoffman escalated her obstructive conduct.

62.     Plaintiffs Walquiria Cassini and Ryan Londono first tried to take Hoffman's deposition on September 25, 2025.  The day before, she requested the deposition be rescheduled because she had the flu.  On October 14, 2025, the date of her next rescheduled deposition, Hoffman refused to appear.  On October 22, 2025, Hoffman insisted that she was too sick to testify.  When she finally appeared, she made it clear she was doing so to avoid being held in contempt, but was extremely uncooperative, answering "I do not recall" to nearly every question. Unable to obtain a useful transcript of the lead investigator, Plaintiffs' criminal counsel offered to reschedule the deposition for October 30, 2025 and duly subpoenaed Hoffman.  On October 30, 2025, Hoffman was, apparently, again, too sick to testify, the same day that the prosecutors dismissed all criminal charges.

63.     Hoffman's refusal to provide sworn deposition testimony or to meaningfully participate in the discovery process deprived Plaintiffs of the ability to fully develop the evidence of their innocence and of Hoffman's misconduct within the criminal proceedings.

**The Prosecution Collapses**

64.     For nearly twenty months following their arrests, Plaintiffs vigorously pursued exoneration while facing mandatory life sentences, enduring incarceration, house arrest with GPS monitoring, internet restrictions, loss of employment, and devastating public stigma.

65.     On October 30, 2025, on the eve of trial, prosecutors dismissed the charges against all three Plaintiffs, acknowledging they could no longer proceed in good faith after a thorough review of

digital and testimonial evidence. Prosecutors referenced evidence they characterized as "newly discovered," but it was only "newly discovered" because it was finally disclosed by Hoffman.

**Ongoing Harm**

66.     Even after the dismissal of all charges, Plaintiffs continue to suffer the consequences of Hoffman's unlawful conduct. The public stigma of having been publicly accused, arrested, and prosecuted for child sexual abuse and exploitation persists and continues to cause Plaintiffs ongoing reputational, professional, and emotional harm.

67.     Plaintiff Walquiria Cassini continues to fight for reunification with her biological children.

68.     Even months after dismissal of the criminal charges, Plaintiffs Walquiria Cassini and Ryan Londono were detained for hours upon arrival at Fort Lauderdale International Airport by Customs and Border Patrol who demanded to seize and search their cellphones. This was yet another collateral consequence of their unconstitutional arrest and prosecution. The shadow of Hoffman's unlawful conduct continues to follow them.

## COUNT I – FALSE ARREST PURSUANT TO 42 U.S.C. § 1983

### Plaintiffs Walquiria Cassini, Matthew Cassini and Ryan Londono v. Amy Hoffman

69.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

70.     The Fourth Amendment protects citizens from arrests secured by law enforcement officers through materially false statements or omissions made knowingly or with reckless disregard for the truth.   Under *Franks v. Delaware*, 438 U.S. 154 (1978), material omissions and misrepresentations in an arrest warrant affidavit violate the Fourth Amendment. *See also Kelly v. Curtis,* 21 F.3d 1544, 1554-55 (11th Cir. 1994).

15

71. The Supreme Court has repeatedly explained that "probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). The Court held that probable cause is not a technical, legalistic concept but a practical, common-sense determination *based on all facts and circumstances known to the officer at the time*, taken together rather than evaluated in isolation. *Illinois v. Gates*, 462 U.S. 213 (1983).

72. Hoffman acted under color of law to cause Plaintiffs to be arrested pursuant to a probable cause affidavit rife with material misrepresentations and omissions. Most significant were Hoffman's misrepresentations concerning digital evidence purportedly corroborating allegations that Plaintiffs had engaged in internet sexual exploitation of children. Her explosive allegation that Ryan Londono deleted evidence the day after her investigation began had already been debunked. Details of Plaintiffs' private and legal internet activities insinuated sinister implications unsupported by the facts. Hoffman based these misrepresentations on evidence she obtained working with the FBI. Yet the evidence itself, which Hoffman had full access to *prior* to Plaintiffs' arrest, did not link Plaintiffs to any child sexual abuse material at all. Hoffman either knowingly misrepresented facts or failed to understand the evidence upon which she based her arrest – a reckless disregard for the truth. Nor did Hoffman seek clarification from the lead FBI agent working on the case. That agent saw Hoffman's arrest affidavit for the first time *after* Plaintiffs' arrests.

73. Equally material were Hoffman's omissions. She failed to disclose that the allegations of child sexual abuse were lodged in the midst of a contentious child custody dispute, after Plaintiff Walquiria Cassini reported to her agency that her children had been kidnapped. Hoffman omitted

16

that the allegations of child sexual abuse were uncorroborated by *any* physical evidence, including medical examinations of the complainants.  She failed to mention critical evidence in her possession from M.A.M.'s cell phone, either because she did not bother to look at it before arresting Plaintiffs, or because she did not like what she found.

74.     Excising the misrepresentations and restoring the omissions from Hoffman's affidavit, the affidavit does not support a finding of probable cause as to any of the three Plaintiffs.

75.     In essence, the only evidence supporting Plaintiffs' arrests were the uncorroborated allegations made by M.J.M. and M.A.M. on November 27, 2023.

76.     Critically, PBSO did not arrest any of the Plaintiffs at the time those disclosures were made, or in any reasonable proximity thereto. Instead, PBSO waited approximately four months before executing the arrests.

77.     That extended delay is itself powerful evidence that PBSO and Hoffman did not regard the children's recorded statements, alone, as sufficient to establish probable cause.

78.     Under the Fourth Amendment, probable cause is assessed based on the totality of the circumstances known to the officer at the time of arrest. *See United States v. Blasco*, 702 F.2d 1315 (11th Cir. 1983). An agency that withholds arrest for four months while actively seeking additional corroboration cannot credibly claim that the initial disclosures alone supplied the constitutional predicate for seizure.

79.     Faced with a four-month investigation that produced no corroborating evidence and had affirmatively exculpated Plaintiffs on a central prong of the alleged conduct, Hoffman did not decline to seek arrests or correct the record. Instead, she drafted a probable cause affidavit deliberately structured to mislead by omitting the exculpatory subpoena findings, distorting the significance of the digital evidence, and presenting the children's statements in a manner calculated

17

to sensationalize rather than contextualize and inform. The result was an affidavit that created the illusion of probable cause where the actual known evidence supported none. This is precisely the conduct the Fourth Amendment forbids. *See Franks*, 438 U.S. at 155–56 (1978) (holding that a warrant affidavit containing deliberate or reckless misrepresentations violates the Fourth Amendment, and that probable cause must be assessed on the basis of what the affidavit would have shown had the truth been told).

80.     The arrests of Plaintiffs on March 5, 2024, violated the Fourth Amendment.

81.     As a direct and proximate result of Hoffman's unlawful conduct, Plaintiffs suffered damages including, but not limited to, loss of liberty, physical and emotional distress, reputational harm, loss of employment and income, and all other damages set forth herein.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Hoffman for compensatory damages, punitive damages, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

## COUNT II – UNLAWFUL DETENTION VIOLATING FOURTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983

### Plaintiffs Walquiria Cassini, Matthew Cassini and Ryan Londono v. Amy Hoffman

82.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

83.     Pretrial detention violates the Fourth Amendment not only when it precedes, but also when it follows the start of legal process in a criminal case. *Manuel v. City of Joliet*, 580 U.S. 357, 364 (2017).  The Supreme Court in *Manuel* found broad consensus among the circuits that officers can be liable for Fourth Amendment violations where they caused *continued* pre-trial detention after the absence of probable cause became apparent. *Id.*

18

84. Where a legal proceeding purporting to establish probable cause is itself tainted by fabricated or materially misleading evidence, any pretrial detention or restriction of liberty resulting from that proceeding violates the Fourth Amendment. *Id.*

85. Despite the constitutional infirmity of the probable cause determination, Plaintiffs were subjected to pretrial detention after their arrests. First, in custody for almost five months in the Palm Beach County Jail, then on restrictive house arrest with GPS monitoring and severe conditions for a period of nearly fifteen months.

86. Throughout that period, Hoffman possessed and continued to accumulate evidence that further undermined the probable cause basis for Plaintiffs' detention, including subpoena responses, digital evidence, DNA evidence, and both the FBI and PBSO's exhaustive review of Plaintiffs' digital devices that revealed no child sexual abuse material.

87. Hoffman took no action to correct her affidavit, inform prosecutors of the deficiencies in her conclusory accusation, or bring that information to the attention of the court.

88. To the contrary, Hoffman actively worked to perpetuate Plaintiffs' detention by providing inaccurate testimony at the May 10, 2024 pretrial detention hearing and by withholding exculpatory evidence from the State Attorney's Office and defense counsel.

89. Hoffman's affirmative actions to sustain the prosecution and Plaintiffs' continued detention constituted an ongoing Fourth Amendment violation extending from the date of arrest through dismissal of the charges on October 30, 2025.

90. Plaintiffs' prolonged detention under conditions of house arrest, ankle monitoring, internet restrictions, and no-contact orders constituted a continuing seizure of their persons within the meaning of the Fourth Amendment.

91. As a direct and proximate result of Hoffman's unlawful conduct, Plaintiffs suffered damages including, but not limited to, loss of liberty for nearly twenty months, physical and emotional distress, loss of employment and income, inability to participate meaningfully in their own defense, and all other damages set forth herein.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Hoffman for compensatory damages, punitive damages, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

## COUNT III – MALICIOUS PROSECUTION VIOLATING FOURTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983

**Plaintiffs Walquiria Cassini, Matthew Cassini and Ryan Londono v. Amy Hoffman**

92. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

93. To plead a Fourth Amendment malicious prosecution claim under section 1983, a plaintiff must show both a violation of his or her Fourth Amendment right to be free of unreasonable seizures and the elements of the common law tort of malicious prosecution. *See Williams v. Aguirre*, 965 F.3d 1147, 1157 (11th Cir. 2020). The common law elements of malicious prosecution require a plaintiff to plead that the officer (1) instituted or continued a criminal prosecution against him or her, (2) with malice and without probable cause, (3) that terminated in his or her favor, and (4) caused damage. *Id*.

94. Hoffman acted under color of law to initiate and continue a criminal proceeding against Plaintiffs in the absence of probable cause.

20

95.     Hoffman acted with actual malice that is, with knowing disregard of Plaintiffs' rights and with the intent to secure their prosecution by distorting evidence, omitting material facts, and concealing exculpatory evidence to continue the prosecution. She was motivated by the accolades and accompanying publicity rather than legitimate law enforcement purposes.

96.     The prosecutions initiated and continued by Hoffman were terminated in favor of Plaintiffs by the prosecution's dismissal of all charges on October 30, 2025.

97.      Hoffman's investigative conduct reflects a confirmation bias that infected the integrity of the entire investigation, as evidenced by her failure to account for or disclose the FBI's exculpatory forensic findings while simultaneously overstating the significance of attenuated digital evidence in her probable cause affidavit.

98.     Throughout the prosecution, Plaintiffs suffered a deprivation of liberty pursuant to legal process in the form of physical incarceration, house arrest, GPS monitoring, internet restrictions, no-contact orders, and all associated restrictions on their freedom.

99.     As a direct and proximate result of Hoffman's malicious prosecution, Plaintiffs suffered all of the damages described herein.

        **WHEREFORE,** Plaintiffs demand judgment against Defendant Hoffman for compensatory damages, punitive damages, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

## COUNT IV – FABRICATION OF EVIDENCE AND DEPRIVATION OF LIBERTY VIOLATING FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983

**Plaintiffs Walquiria Cassini, Matthew Cassini and Ryan Londono v. Amy Hoffman**

100.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

101.  The Fourteenth Amendment's guarantee of substantive due process prohibits government officials from deliberately fabricating evidence used to deprive a person of liberty. *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993); *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004); *See also Riley v. City of Montgomery, Ala.*, 104 F.3d 1247, 1253 (11th Cir. 1997) (holding that officer did not have qualified immunity from § 1983 malicious prosecution claim where question of fact existed regarding whether officer planted cocaine in plaintiff's car).

102.  A plaintiff establishes a fabrication of evidence claim under § 1983 by showing that an investigating official deliberately fabricated evidence and that the deliberate fabrication caused the plaintiff's deprivation of liberty. *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).

103.  Hoffman deliberately fabricated and/or distorted material evidence by asserting that Plaintiff Ryan Londono deleted evidence from motherless.com the day after the investigation began.  Hoffman knew or should have known, prior to Plaintiffs' arrests, that Plaintiffs had no connection to motherless.com or the username "bigp92".  Hoffman's unsupported allegation of Plaintiff Ryan Londono's destruction of evidence infected the case from the outset.

104.  Hoffman continued to perpetuate this distortion at the Plaintiffs' May 10, 2024 pretrial detention hearing, asserting that the motherless.com account that deleted files was linked to Plaintiffs' home IP address.  Even before Plaintiffs' arrest, the only home IP address linked to the motherless.com account had been identified as belonging to an unrelated individual in Zephyrhills, Florida.

105.  Hoffman falsely documented in supplemental investigative reports that Plaintiff Walquiria Cassini refused to submit to a polygraph examination, when audio recordings establish that it was the examiner who declined to proceed.

106. Each of these fabrications was made deliberately and intentionally for the purpose of securing Plaintiffs' arrest and prolonging their detention, or with reckless disregard for the truth.

107. Each fabrication was material and was relied upon by prosecutors and judges to deprive Plaintiffs of their liberty.

108. As a direct and proximate result of Hoffman's fabrication of evidence, Plaintiffs suffered deprivation of liberty, reputational harm, emotional distress, loss of employment, and all other damages set forth herein.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Hoffman for compensatory damages, punitive damages, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

## COUNT V – SUPPRESSION OR DESTRUCTION OF EXCULPATORY EVIDENCE VIOLATING FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983

**Plaintiffs Walquiria Cassini, Matthew Cassini and Ryan Londono v. Amy Hoffman**

109. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

110. The Fourteenth Amendment's guarantee of due process imposes an obligation on law enforcement to disclose material exculpatory evidence to the prosecution and, through the prosecution, to the defense. *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

111. A law enforcement officer acting under color of state law who deliberately suppresses material exculpatory evidence causes a deprivation of the accused's constitutional rights and is liable under 42 U.S.C. § 1983. *McMillian v. Johnson*, 88 F.3d 1554 (11th Cir. 1996).

23

112.   As set forth herein, Hoffman suppressed and withheld the following material and exculpatory evidence:

   a. M.J.M's cellphone extraction report provided to Hoffman by the FBI on March 2, 2024, containing exculpatory evidence favorable to Plaintiffs, which was withheld from the State Attorney's Office and from defense counsel for approximately nineteen months despite repeated requests;

   b. The audio recording of Hoffman's post-arrest cellphone recorded interview of Plaintiff Walquiria Cassini, which was never submitted to the State Attorney's Office or provided to the defense;

   c. Omission and concealment of the FBI's subpoena returns that established no connection between Plaintiffs and any viewing, possession or dissemination of child sexual abuse material; and

   d. 31 pages of supplemental reports neither disclosed to Plaintiffs or prosecutors, including supplemental reports indicating when DNA testing began and when the accuser's DNA was *excluded* from all seized and tested items.

113.   Each of these items constituted material exculpatory evidence within Hoffman's possession and control.

114.   Hoffman's suppression of this evidence was deliberate. Hoffman failed to log her receipt of a working copy of M.J.M.'s cellphone extraction report and to date has refused to articulate what she did with it. When asked for it by Plaintiffs' criminal defense counsel, she affirmatively misrepresented on multiple occasions that she did not know which phone was being referenced when asked about the extraction report.  When confronted with evidence that she received the extraction report on March 2, 2024, she drove to Miami to obtain a new copy of it on October 16,

2025, more than 18 months later.  She actively concealed the FBI's subpoena results by omitting them from her affidavit and presenting a contradictory narrative. She never disclosed the recorded interview she conducted of Plaintiff Walquiria Cassini.

115.    Had this exculpatory evidence been timely disclosed, it would have materially altered the course of the prosecution, the probable cause determinations made by the court, and the duration of Plaintiffs' pretrial detention.

116.    As a direct and proximate result of Hoffman's suppression of exculpatory evidence, Plaintiffs suffered deprivation of their due process rights, prolonged pretrial detention, and all other damages set forth herein.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Hoffman for compensatory damages, punitive damages, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

### COUNT VI – *MONELL* CLAIM, OFFICIAL POLICY IN VIOLATION OF THE FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983

**Plaintiffs Walquiria Cassini, Matthew Cassini and Ryan Londono v. Ric Bradshaw, in his Official Capacity as Sheriff of Palm Beach County, Florida**

117.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

118.    As set forth above, Plaintiffs suffered violations of their Fourth and Fourteenth Amendment rights as a result of Hoffman's post-arrest suppression and/or destruction of exculpatory evidence and her failure to disclose investigative developments to prosecutors, resulting in their prolonged unconstitutional detention for nearly twenty months.

119. A municipality or county sheriff's office may be held liable under 42 U.S.C. § 1983 where a plaintiff demonstrates that a constitutional deprivation was caused by an official policy, custom, or practice of the governmental entity. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

120. Defendant Bradshaw, as the duly elected Sheriff of Palm Beach County, is the final policymaker for PBSO with respect to law enforcement operations, investigative protocols, and evidence disclosure obligations. His policies, practices, and customs — including the deliberate absence of policies — are attributable to the County for purposes of § 1983 liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

121. At all times relevant hereto, Defendant Bradshaw, as final policymaker, sanctioned a de facto policy, custom, and practice of imposing no affirmative obligation on lead detectives to disclose to the State Attorney's Office newly discovered evidence, most disturbingly exculpatory information, that materialized after an initial arrest.

122. PBSO's official policy and procedure required law enforcement officers to turn over all reports and exculpatory evidence to the State Attorney's Office prior to commencement of a prosecution. The prosecution begins once the charging document is filed. The policy is silent and there are no procedures in place as to the ongoing duty to unsolicitedly turn over all exculpatory evidence after a prosecution commences.

123. Instead, PBSO's operative practice was that prosecutors bore the entire burden of affirmatively requesting from PBSO any new evidence or information pertaining to an ongoing investigation. Hoffman confirmed this policy in her limited deposition testimony on October 22, 2025, in her explanation why supplemental reports from after Plaintiffs' arrests had not been disclosed to prosecutors. Hoffman provided explicit sworn testimony that she was under no

departmental obligation to inform the State Attorney's Office that the investigation had progressed or that new information had been discovered after Plaintiffs' arrests.

124. PBSO imposed no corresponding duty on its detectives to proactively communicate post-arrest investigative developments to prosecuting authorities.

125. The existence of PBSO's written policy requiring disclosure of exculpatory material *prior* to prosecution establishes that PBSO was institutionally aware of its detectives' disclosure obligations and made a deliberate choice about the scope of that obligation.

126. The policy's silence is not an oversight; it was an affirmative structural choice. A policymaker who codifies disclosure obligations up to the moment of arrest while deliberately declining to extend them into the post-arrest period has chosen to leave pretrial detainees constitutionally unprotected. That deliberate choice, and Bradshaw's failure to remedy it, was the moving force behind Plaintiffs' nearly twenty months of unconstitutional detention.

127. As a direct and proximate result of Sheriff Ric Bradshaw and PBSO's policy permitting non-disclosure of exculpatory evidence, Plaintiffs suffered deprivation of their due process rights, prolonged pretrial detention, and all other damages set forth herein.

**WHEREFORE**, Plaintiffs demand judgment against Ric Bradshaw, in his Official Capacity as Sheriff of Palm Beach County, Florida for compensatory damages, punitive damages, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

**COUNT VII – *MONELL* CLAIM, FAILURE TO SUPERVISE IN VIOLATION OF THE FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983**

**Plaintiffs Walquiria Cassini, Matthew Cassini and Ryan Londono v. Ric Bradshaw, in his Official Capacity as Sheriff of Palm Beach County, Florida**

128.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

129.    As set forth in the foregoing counts, the deprivation of Plaintiffs' constitutional rights was the foreseeable and preventable consequence of PBSO's complete failure to train its officers and to supervise Hoffman's exercise of investigative authority.

130.    A municipality is liable under 42 U.S.C. § 1983 where its failure to supervise subordinate employees reflects deliberate indifference to the obvious risk of constitutional violations. *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989); *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).

131.    Deliberate indifference may be established where the need for greater supervisory oversight is so obvious, and the constitutional consequences of the supervisory failure so predictable, that a policymaker can reasonably be said to have chosen to expose persons to the risk of constitutional harm. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997).

132.    Defendant Bradshaw, as the final policymaker for PBSO, was responsible at all times for establishing, implementing, and enforcing policies and practices governing the supervision of investigative personnel within PBSO's Special Victims Unit.

133.    PBSO's Special Victims Unit investigates allegations of child sexual abuse yet failed to establish procedures to corroborate allegations made by children, especially in the context of an ongoing custody dispute between parents. Hoffman was not trained on warning signs or indicia of manipulation, coaching and parental alienation. This is a systemic problem given PBSO's lack of training that has caused others to be wrongfully arrested.  Indeed, PBSO did not even institute separate policies or procedures differentiating investigations of alleged child sex crimes from alleged adult crimes.

28

134. Despite this obvious need, Defendant Bradshaw maintained the following critical supervisory failures:

    a. PBSO maintained no policy or practice requiring supervisory review of an investigation's continuing evidentiary basis following arrest, whether at scheduled intervals, upon the discovery of new evidence, or upon a court's review of probable cause;

    b. PBSO maintained no policy requiring supervisors to ensure evidence received from cooperating federal law enforcement agencies was properly logged, disclosed to prosecutors and produced to the defense in compliance with constitutional and statutory obligations;

    c. PBSO maintained no policy requiring its detectives to seek review and approval from federal law enforcement partners of arrest affidavits incorporating conclusions derived from investigative work performed by outside agencies; and

    d. PBSO maintained no policy requiring or even encouraging supervisors to intervene in an ongoing investigation or prosecution upon the discovery of evidence suggesting that the probable cause basis for a detainee's continued confinement had been undermined.

135. As a direct consequence of these supervisory failures, Hoffman operated from December 2023 through October 2025 without any meaningful supervisory check on her investigative conduct, her evidentiary representations to the court, her disclosure obligations, or her treatment of exculpatory evidence.

136. The absence of supervisory oversight was not an isolated lapse. It was a systemic institutional condition that permitted Hoffman's individual misconduct to go undetected, uncorrected, and unchecked for the entirety of Plaintiffs' prosecution.

137. The need for supervisory oversight of SVU detectives handling cases involving mandatory life sentences is not a complex policy question requiring specialized expertise. It is, as the Supreme Court has recognized, the kind of need so obvious that a policymaker's failure to address it constitutes deliberate indifference. *City of Canton*, 489 U.S. at 390 n.10.

138. PBSO's failure to train and supervise Hoffman was the direct and proximate cause of Plaintiffs' constitutional injuries, including their prolonged unlawful detention, deprivation of due process, fabrication of evidence against them, and suppression of exculpatory material.

   **WHEREFORE**, Plaintiffs demand judgment against Ric Bradshaw, in his Official Capacity as Sheriff of Palm Beach County, Florida for compensatory damages, punitive damages, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

   **WHEREFORE,** Plaintiffs respectfully request that judgment be entered in their favor as follows:

   a. **Declaratory Judgment:** Providing that Defendants' individual and collective conduct violated Plaintiff's constitutional rights;

   b. **Compensatory Damages**: Including but not limited to the monetary value of Plaintffs' prolonged unlawful detention, deprivation of due process, and Plaintiffs' ongoing reputational, professional, and emotional harm;

   c. **Punitive Damages** as permitted by law;

30

d. **Attorney's Fees and Costs** as permitted by law;

e. **Discretionary Damages and Relief**: such other financial or equitable relief that the Court

deems reasonable and just.

## JURY TRIAL DEMAND

Plaintiffs demand trial by jury of all issues in this cause so triable as a matter of right.

Respectfully submitted this 5th day of March, 2026.

*/s/ Harry Kaklamanakis*
Haralambos Kaklamanakis, Esq.
Florida Bar No. 1004425
Tarnovsky Lopez Law PLLC
7000 W. Palmetto Park Road, Suite 210
Boca Raton, FL 33433
Office: (561) 368-2755
Email: harry@tarnovskylaw.com
Email: cande@tarnovskylaw.com
Email: service@tarnovskylaw.com

*/s/ Matthew A. Goldberger*
Matthew A. Goldberger | Matthew@soflajustice.com
Florida Bar No.  119897
*/s/ Mac Kenzie Sacks*
Mac Kenzie Sacks | Mackenzie@soflajustice.com
Florida Bar No. 1011100
GOLDBERGER, SACKS, & SALADRIGAS PLLC
1555 Palm Beach Lakes Blvd., Suite 1400
West Palm Beach, Florida 33401
Tel: (561) 659-8337; Fax: (561) 284-8938

## RULE 11 CERTIFICATION

Under Federal Rule of Civil Procedure 11, by signing above, I certify to the best of my knowledge,

information, and belief that this complaint: (1) is not being presented for an improper purpose,

such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is

supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing

31

existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

*/s/ Harry Kaklamanakis*
Haralambos Kaklamanakis, Esq.
Florida Bar No. 1004425
Tarnovsky Lopez Law PLLC
7000 W. Palmetto Park Road, Suite 210
Boca Raton, FL 33433
Office: (561) 368-2755
Email: harry@tarnovskylaw.com
Email: cande@tarnovskylaw.com
Email: service@tarnovskylaw.com